IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

v.

MARQUIES BROWN,

          Defendant.

No. 16-cr-16 (RGA)

### Memorandum Opinion

Libby Van Pelt, Assistant United States Attorney, for the Government.

Dina Chivar, Assistant Federal Public Defender, for Defendant.

June 15, 2017

*Richard G. Andrews* [signature]
ANDREWS, U.S. DISTRICT JUDGE:

Defendant Marquies Brown was convicted on February 2, 2017 of being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (D.I. 46). He stipulated to a prior felony conviction. Thus, the main issue at trial was whether he possessed a firearm on December 9, 2015. At trial and again after trial, Defendant moved for a new trial based on two remarks made by the prosecutor during closing arguments. Defendant also moved for a judgment of acquittal notwithstanding the verdict. For the following reasons, those motions (D.I. 58) are denied.

## I. MOTION FOR A NEW TRIAL

Federal Rule of Criminal Procedure 33 allows me to grant a new trial "if the interest of justice so requires." As a basis for his Rule 33 motion, Defendant points to two separate remarks made by the prosecutor during closing arguments.

### A. The Challenged Remarks and Related Trial Testimony

The trial spanned three days, during which the jury heard from several law enforcement officers, including Detective Deshaun Ketler and Detective Ray Mullin, and saw extensive video footage and photo stills from the day of the arrest.

#### i. *Relevant Trial Testimony*

Detective Deshaun Ketler is a ten-year veteran of the Wilmington Police Department currently serving as a surveillance officer in the Drug, Organized

Crime, and Vice Unit. (Tr. at 142–43).[1] At trial, Ketler testified to his observations on December 9, 2015. He testified he was surveilling a house on 6th and Adams Street in Wilmington when Defendant walked by the passenger side door, cellphone in hand, wearing a blue overcoat. (Tr. at 143–44). Ketler recognized Defendant from the community. (Tr. at 143). After disappearing out of sight for a few minutes, Defendant reappeared, this time without the overcoat and off the phone. (Tr. at 145). Defendant passed in front of Ketler's vehicle and continued walking down the street. (Tr. at 145, 147–48).

Ketler testified that after Defendant had passed his car and continued walking, he then "observed a large bulge coming out of [Defendant's] right side, around his right hip area, which is a firearm." (Tr. at 149). Ketler also testified he observed Defendant pulling on his jacket and hitting his right side with his elbow and that he trained his binoculars on Defendant and observed "the protrusion was a lot more as he was pulling down, which was identical to the gun that we recovered." (*Id.*).

At trial, Ketler stated he was "[a] hundred percent" certain Defendant had a gun. (Tr. at 155–56).

During cross-examination, defense counsel brought out several relevant details. For example, Defendant's right side, where Ketler testified he saw the bulge, was facing away from Ketler. (Tr. at 170). In response to questioning, Ketler

---

[1] D.I. 53 contains the pretrial transcript. D.I. 54 contains the trial transcript pages 1–272. D.I. 55 contains the trial transcript pages 273–461. D.I. 56 contains the trial transcript pages 462–567.

3

clarified, "I did not see the actual firearm..." (Tr. at 171). Defense counsel also brought out that in his incident report Ketler did not mention Defendant was on a cellphone when Ketler first saw him or that after arrest Ketler found a hairbrush in Defendant's left pocket. (Tr. at 168, 190). Ketler also acknowledged that he had stated only that Defendant "possibly" had a firearm several times: on the day of the incident over the radio, in the incident report, and at a prior hearing under oath. (Tr. at 172).

Later in the trial, Detective Ray Mullin testified. Mullin was the chief investigating officer for Defendant's case and pursued Defendant the day of the arrest.

On December 9, Mullin was out in Wilmington with his partner. (Tr. at 221–22). He testified that his partner was "a black male, big bushy beard, his hair is styled various ways from week-to-week, about 6 foot tall, 250 pounds or so." (Tr. at 222). That day, his partner was wearing a "wool winter cap, dark in color hoodie. I believe it was black, and some variation of cargo pants. If [I] remember correctly, dark in color." (*Id.*).

Mullin also testified about his own appearance, describing his clothes as street clothes and saying "my hair was not combed. It was quite scruffy. I had [] quite an [unkempt] beard look for lack of a better term." (Tr. at 223). Mullin and his partner were riding that day in a black Ford Expedition, unmarked, with rear tinted windows. (Tr. at 224).

After describing his appearance and the appearance of his partner, Mullin walked the jury through extensive video tape that showed his vehicle circling in and out of frame and showed Defendant at times running and at times walking.

### ii. The Challenged Remarks

Ketler's testimony was the subject of one of the prosecutor's contested remarks. The prosecutor opened her closing with a description of the condition of the gun when found and then turned to Ketler's testimony. She said:

> This is the intersection of Sixth and Adams Street, that pink dot. That's where Ketler saw the defendant with the gun. He told you he saw him with the gun. He showed you how he saw the gun. He told you he saw it because the magazine was extended out of the grip of the gun. He said he had been doing undercover police work for some time. *He carries a gun. He knows what a gun looks like. He's trained to recognize them.*

(Tr. at 524) (emphasis added).

Immediately, Defendant objected (*Id.*). At that point, I did not allow any argument on the basis for the objection and instructed the jury:

> "All right.
>
> I think the objection here is, [defense counsel's] memory of the testimony is, there may not have been any evidence of as to his training and recognition of a gun is.
>
> In the end, you're the judges of the facts, and what the lawyers say is just argument. So you're memory is going to control."

(Tr. at 524–25). The prosecutor proceeded, closing her discussion of Ketler and turning to the testimony of Detective Ray Mullin. The prosecutor spun the following theory as to why Defendant could be seen on the tape running before uniformed police officers entered the frame:

5

> Now, let's talk for a minute about Detective Mullin and his partner who he was with. This is the best shot of their vehicle that day. It's a black Ford Expedition. The rear windows are tinted, but not the front ones.
>
> Detective Mullin told you that he was driving. He told you that back on that day his appearance was unkempt. He had an scruffy beard. He also described his partner, Special Agent Jones, who was sitting in the passenger seat. He described him, because you haven't seen him; 6 feet tall, about 200 pounds, black male, scruffy, bushy. I think he said a bushy beard with a black winter cap and a hooded sweat shirt.
>
> Now, as Detective Mullin and his partner pass the defendant -- drive pass the defendant on the street, what does the defendant do? He's looking at him, and again and again and again and again. Why? Why is the defendant looking at them? They are not in a police car. Why is he looking at an unmarked car?
>
> ...
>
> Now, at some point this in this block, he slows to a walk. He slows to a walk.
>
> Why did the defendant run two plus blocks from two scruffy men in a Ford Expedition?
>
> And did it have anything, and did it have anything to do with the reason why the defendant was carrying a gun?...
>
> I submit to you that the defendant didn't recognize Detective Mullin and his partner in their car as un[der]cover cops. He thought they were somebody else, so he runs down this block.

(Tr. at 525–28). Defendant immediately objected and I overruled that objection without discussion. (Tr. at 528).

At the end of the prosecutor's closing statement, Defendant moved for a mistrial based on those remarks. (Tr. at 534). I denied the motion. (Tr. at 535).

**B.    Analysis**

Defendant attacks these remarks as violations of my prior orders. Defendant also attacks them as generally inappropriate, in particular, as vouching.

### iii. No Violation of Court Order

The prosecutor's remarks did not violate my prior orders. I issued two relevant orders before and during trial.

First, before trial, Defendant filed a motion *in limine* requesting the Government be limited from eliciting testimony that Defendant's actions were consistent with the characteristics of an armed gunman. (D.I. 29). At the pretrial conference, the Government agreed it would not elicit testimony that Defendant's actions were consistent with an armed gunman, but instead would stick to factual observations. (PTC Tr. at 72) ("But putting that aside, on direct examination, no, I don't think there needs to be any mention of characteristics of armed gunmen."). I also expressed my opinion that such testimony would be expert testimony "because the person is bringing their professional experience and training. As I recall, officers get trained on this in particular. It's not something that is generally known... it's only generally known to the police, because they get trained on it." (PTC Tr. at 80).

The Government then pushed to be allowed to have officers testify to their own experiencing carrying a gun and to testify they touch their side when they carry a gun. (PTC Tr. at 72). I reserved judgment at the conference. (PTC Tr. at 80). Before trial I issued the following order:

> Defendant moves to exclude testimony that Defendant's actions were consistent with those of an armed gun man and that the way Defendant's pocket hung was consistent with a gun. That motion is **GRANTED**. While the Government's witnesses are free to relay their actual observations, they are prohibited from opining that these observations are consistent with some general way that armed gun men act as they have not been qualified as experts.

7

>       Further, the Government is prohibited from eliciting testimony that
> police officers touch their side when carrying a gun themselves. What an
> officer carrying a holstered gun on his belt does is irrelevant to
> understanding Defendant's behavior when he was allegedly carrying a gun
> loose in his pocket.

(D.I. 37 at 5).

The second relevant order came during trial. During the trial, the Government introduced its theory for the first time that Defendant did not recognize Mullin and his partner as police officers. Instead, the Government proposed, Defendant thought they were "after him" and "he was carrying a firearm because he was at risk of other people coming after him, and perpetrating violence on him." (Tr. at 259). The Government asked permission to play a clip for the police's interview of Defendant where he states, "All I know is this bombed-out car kept circling and I don't know who it was." (Tr. at 259–64). I excluded the video explaining:

> So, a motive as to why somebody might be carrying a gun, that's a relevant topic.
>
> I'm not sure how much of what the government proffers is actually a motive. It seems to me it's a very thin basis for argument.
>
> It also seems to me to be -- and as [the prosecutor] has candidly admitted -- and maybe not switching horses in midstream, but significantly switching what the government wants to do, and which I think is at best tangentially related to the rulings that I've made in favor of allowing in some pieces of video for the defendant.
>
> So, you know, if there's -- if the defendant does take the stand, which seems pretty unlikely, but if he does, it's one thing to cross-examine him with it. I'm assuming you'll be putting out the probation story, which may or may not be true, but, in any event, presumably that's what he would say.
>
> But I think that -- I think that it's -- I think under all the circumstances that we now get ourselves to where we are right now, it's unfairly -- it's unfair to -- I think that, in fact, it's basically too thin a [reed] to support this very

8

prejudicial, essentially he's a gang banger in opposition to other gang bangers who might have guns, who probably do have guns.

(Tr. at 269–70).

While the prosecutor's comments touch on the topics of these orders, she did not violate them. She did not ask any questions about the characteristics of an armed gunman, about any officer's experience carrying a gun, or about the officer's training. She also did not play the excluded video clip or bring up the "bombed-out car" comment. Thus, she did not violate my orders.

      *iv.    Improper Remarks*

Defendant challenges the prosecutor's remarks as improper. If I determine the remarks are improper, I must then consider, in light of the record as a whole, whether the impropriety was harmless. *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc). When non-constitutional error is alleged, I must find that "it is *highly probable* that the error did not contribute to the judgment." *Id.* High probability requires that the court possess "sure conviction that the error did not prejudice the defendant." *Id.* (internal quotation marks omitted).

It is improper when a prosecutor makes arguments which are not supported by or misrepresent the record. *See United States v. Brown*, 765 F.3d 278, 296–97 (3d Cir. 2014); *United States v. Mastrangelo*, 172 F.3d 288, 296–98 (3d Cir. 1999). It is also improper when a prosecutor vouches for a witness. Vouching occurs when the prosecutor assures the jury of the credibility "of a Government witness through personal knowledge or by other information outside of the testimony before the jury." *United States v. Dispoz-O-Plastics*, 172 F.3d 275, 283 (3d Cir. 1999).

9

In determining if a remark is prejudicial, courts look to three factors: "the scope of the improper comments in the overall trial context, the effect of any curative instructions given, and the strength of the evidence against the defendant." *Mastrangelo*, 172 F.3d at 297.

As I ruled at trial, the prosecutor's first remark, that Ketler was trained to recognize guns, is not supported by the evidence. (*See* Tr. at 535). Obeying my pretrial order, the prosecutor never brought out Ketler's training. The remark is not reversible error, however, for four reasons.

First, I immediately addressed the error. *See, e.g., Zehrbach*, 47 F.3d at 1267; *United States v. Swinehart*, 617 F.2d 336, 340 (3d Cir. 1980). I explained that defense counsel objected because her "memory of the testimony is, there may not have been any evidence of as to his training and recognition of a gun is" and reminded the jury that they were "the judges of the facts," their memory controlled, and "what the lawyers say is just argument." (Tr. at 524–25). Second, the "comments at issue were but [five words] in a closing argument that filled [ten] pages of transcript." *Zehrbach*, 47 F.3d at 1267. Third, Ketler's ability to recognize a gun when he saw it was not an issue of extensive focus. Further, Ketler's testimony did not rely on any claim of expertise. Fourth, the comment was not vouching because the prosecutor did not express her personal opinion.

As to the second contested remark, it was sufficiently supported by the evidence. While the government skirted the spirit of my previous order, the prosecutor did not mention or allude to the "bombed-out car" comment. The factual

10

assertions made in the challenged remarks—the description of the car and the description of the car's occupants—were adduced at trial in Mullin's testimony. The testimony that the car was unmarked and its occupants were dressed in street clothes supports the further assertion that Defendant did not recognize Jones and Mullins as police officers.

The prosecutor also insinuated, but never actually stated, that Defendant was carrying a gun and that he ran from Mullins and Jones because he thought someone was out to get him. The only factual basis for this insinuation was that he ran from the undercover police under circumstances where it is possible he did not know they were police. Thus, it follows he might have been concerned they were out to get him. The prosecutor's insinuation, while at best weakly supported by the evidence, is just that, an insinuation, not an assertion. Further, it did not stray too far from the evidence, just discussed, that was adduced at trial. Thus, I find any impropriety in the second challenged remark insufficient to warrant granting a new trial. I think it is highly probable that the prosecution's insinuation did not contribute to the conviction. As nothing the prosecutor said in closing arguments warrants a new trial, I am denying Defendant's motion.

## II. JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT

Federal Rule of Criminal Procedure 29 directs me to enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction." "The verdict of a jury must be sustained if there is substantial evidence, taking the view most

11

favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942).

There was substantial evidence to support the jury's verdict in this case. Officer Ketler testified he was certain he saw the outline of a gun on Defendant. (Tr. at 155–56). The jury viewed extensive video showing Defendant with a bulge in his pocket. Officer Ketler testified he saw Defendant tapping his pocket with his elbow (Tr. at 149) and the video of Defendant showed him repeatedly touching his pocket as well. The video showed Defendant running from a uniformed police officer. (*See* Tr. at 306–07 (officer appearing in video testifying to same)).

The gun was located near where Defendant was arrested and in a yard Defendant necessarily ran by. The homeowner testified the gun was not hers, that she had not seen it previously, and that she was frequently in her yard. (Tr. at 424–25). The officer that found the gun testified it had fresh mud and grass on it. (Tr. at 350). While the gun did not have Defendant's DNA or fingerprints on it, but had on it the DNA of other individuals, the Government's witness explained DNA and fingerprints could be difficult to extract from guns. (Tr. at 391–92, 416). Taken together, this evidence is more than sufficient to support the guilty verdict.

### III. CONCLUSION

Defendant's motion (D.I. 58) is denied. An order consistent with this opinion will follow.